Good morning, Counsel. Good morning, Your Honor. We'll call the matter then of Vooys et al. v. Bentley et al. Judge Sirica, I assume that our technology is still working and you are there? I'm here. Great. Let me first call upon Counsel for Petitioners, in particular the Supervising Attorney, to introduce folks and tell us how we're going to proceed. Yes, thank you very much, Your Honor. Stephen Bragg, I'm the Director of the Appellate Litigation Clinic at the University of Virginia School of Law. It's my pleasure to introduce two third-year law students this morning who have been granted permission to participate in this case. Ms. Laura Cooley and Mr. Tanner Russo. For the Court's help, Ms. Cooley will spend five minutes of the argument time on the jurisdictional issues. Mr. Russo will then have the balance of ten minutes' time on the merits issues. And Mr. Russo would like to reserve two minutes of rebuttal time with the Court's permission. Very well. Thank you, Your Honor. Thank you very much. So with that, we will proceed with Ms. Cooley. Good morning, Your Honor. It's a pleasure to be here. My name is Laura Cooley and I'm here on behalf of the Petitioners. I would like to begin today by addressing the Respondent's objection to our jurisdictional statement. I hope Counsel Tanner Russo will be addressing the substantive issues of this case. The Respondent says this Court lacks jurisdiction to hear this case under 48 U.S.C. Section 1613. However, the Respondent is wrong for two reasons. First, this Court ruled in Basin and affirmed in Fayette in 2017 that the Savings Clause in Section 1613 applies not only to cases commenced in the Third Circuit, but also— He really—and that's a twofer. He really decided the way it was— decided the way it was because of Basin, but it's really Basin that's the jurisdictional foundation. Why should not we take this opportunity, as the Fayette Bar Association urgently is urging, as a media— why shouldn't we take this opportunity to revisit Basin? Well, under our internal operating procedure 9.1, a panel in this Court is bound by a prior panel's presidential opinion, and Basin is a presidential opinion. Why should we issue an opinion suggesting that we do it occasionally or often, but basically saying that we're bound by the laws that exist in the Basin? Apparently, maybe that would be considered Basin, because we think it was formally decided, but we're bound by it until it's reversed. And then, basically, as we're trying to change the matter of law, why shouldn't we do that? Well, we contend, Your Honor, that Basin was correctly decided. The Basin Court looked at the plain language of the meaning of case or case and found that it has a natural, broad, unambiguous meaning of any judicial proceeding. And then, from there, looked at similar jurisdiction-preserving provisions, which qualified the term case with more specific language when they intended it to only preserve jurisdiction over cases, commencing the appellate court. So, for example, the First Circuit, when they stripped the First Circuit, when Congress stripped the First Circuit of jurisdiction over the Puerto Rico Supreme Court, they said that it would not deprive the First Circuit of the ability to hear appeals taken before the effect of duty of the act. How did that statute differ from the statute that applies to the Persian Islands?  When Congress stripped the First Circuit of intermediate socialized jurisdiction over the Puerto Rico Supreme Court, the main difference was that it qualified the case's commenced language by saying that it applied only to appeals taken before the effect of duty of the act. And Congress did a similar thing when they amended the Supreme Court's socialized jurisdiction in 1988. They said that it did not apply to cases pending in the Supreme Court with the effect of duty of the act. So Congress, when they are making a jurisdiction-stripping provision, intends cases to have a broad meaning, and when they want it to have an arabic meaning, qualify it with terms such as appellate cases commenced or certiorari cases commenced or cases that are pending in the Supreme Court of appeals. And they did not do that here. So the Basin Court was correct in determining that cases commenced in Section 1613 was meant to apply to all cases. What do you make of the language in Slack versus McDaniels? Assume McDaniels. Assume for the moment we're not battling, at least here. The Supreme Court said in Slack that when Congress uses the words cases commenced in a statute directed to an appellate court, it means appellate cases. Should at least the logic of that suggest that we conclude other than how the Basin Court moved? No, Your Honor. The Slack opinion was considering an appellate which is a statute of an entirely different kind than Section 1613. Why should the nature of the statute have any effect on how we view contextually how Congress uses the terms cases commenced? That is to say, if the statute is directed at an appellate court, if that section of the statute is directed at an appellate court, then aren't we talking about appellate cases commenced? There are two reasons I would say that, Your Honor. The first is that because EDPA confers substantive rights, there might be a reason to have cases naturally have a more narrow meaning. And the second reason is because of Congress' use of more specific language in essentially identical jurisdiction stripping, jurisdiction shifting provisions. Drawing any inference from that, it was proper for the Basin Court to conclude that they intended it to have a different meaning in Section 1613 since they passed a number of these types of statutes and used different language in them. The respondent intends that the 9.1 is also not binding under TAN, but TAN doesn't create an exception to 9.1 for two reasons. The first is that in TAN, the case decided by TAN, the conflicting Supreme Court precedent was either intervening or where it was a prior decision. It was either not brought to the attention of or considered by the EPA at all. Let me take you to what is effectively, I realize, a legal policy question, but I'm interested in your answer. We have to acknowledge, or it seems to me that we should acknowledge that under the Basin Rule, we, as the Court of Appeals, are likely to see certain petitions for a number of years ahead, seven or ten years perhaps, given the backlog of cases in the territory courts here. So, why would Congress have wanted us to continue hearing cases from the Supreme Court of the Virgin Islands for so many years after the enactment of 6116? Is there any logical reason you can think of for such an expansive and long-lasting savings clause? I'm sorry, I see my time is up, Judge. No, you do. You have plenty of time. Congress had, potentially, a very good reason for maintaining jurisdiction for such a long time, and that is because plaintiffs filing in the Virgin Islands court system may very well have the client's interest on being able to eventually ask for a redress or charge with this court. It's physically much more likely that... I think you're assuming that plaintiffs, when they file a complaint, they're assuming that they're going to lose, but they have the turn-of-the-wheel and miraculous joy of coming to this court. Do you really reckon that? I do think that plaintiffs would potentially rely on the fact that they might be more likely to be granted review. It's physically much more likely that a plaintiff would be granted review while losing part of the grant review with the first court appeal. So the mere statistical likelihood that the grant is served, you're suggesting, would factor into the expectation? Yes. Judge Sirica, do you have questions of Ms. Cooley? Yes. Are we correct that the backlog is about 6,000 cases right now? I believe so, Your Honor. I'm sorry? I believe so. And does that figure into your expectation that you're not going to get the trial in one period of time? I'm sorry, Your Honor, I didn't hear the question. You were talking about the expectation of the person who trials a lawsuit. Would that backlog figure into your expectation as to why you shouldn't disappoint people? Not necessarily, Your Honor. A plaintiff filing a case might not be aware of the backlog at the time they're filing, but because they can look at the statute, would be aware of the fact that at least up until the point of 15 years when this circuit's jurisdiction was intended to expire, or when the statute's power-stripping of jurisdiction, they would have known that they would have the opportunity to appeal to this court. I think the lawyers are aware of the backlog. Potentially, Your Honor, but there are pro se plaintiffs filing different amounts of courts as well as representative parties. So they would not file a lawsuit. A plaintiff with a rare choice of name would not file a lawsuit if they didn't think they were going to get a chance to argue before a successive U.S. Supreme Court. If they had other venues to which they could go, they wouldn't make that decision. I'm sorry? If they had other venues to which they could go, they wouldn't make that strategic decision. Thank you. Mr. Russo. Mr. Russo has 10 minutes. Thank you. Many technology problems here in the Senate right now. How many judges does it take to set it up?  Well, not as many as it would take judges, I guess. Yeah, we just started. That's good. This shows 1029. We can start that. We're testing your nerves, Mr. Russo. Let's start. Thank you, Your Honors. Good morning. My name is Tanner Russo. Also here on behalf of the Petitioner, and I'll address the substantive equal protection and privileges and immunities clause claims in this case. Your Honors, the court below should be reversed for two chief reasons. First, the court erred in concluding that Section 547 burdens the fundamental right of access to the courts. Because Section 547 preserves reasonable and adequate access for non-resident plaintiffs. When you talk burdening, you're talking equal protection? Your Honor, I think with both of the substantive claims here, equal protection and privileges and immunities, the threshold antecedent question for both is whether there is a burden to apply. What if it just discriminates, but it's not a court burden per se? It simply discriminates based upon state of questions. I think under the equal protection clause, Your Honor— Forget equal protection. That's what I'm trying to get you into. Privileges and immunities. Equal protection, I would read that as a burdening because you've got Section 514, plus the bond here. As a restorer, this is not burdening, even assuming access to the courts is a fundamental right, as the court has suggested. In some situations, that is. That seems to be a more clear-cut issue. And the privileges and immunities clause. That's why I'm asking if under the privileges and immunities analysis, when you're talking about discriminating based upon residency as opposed to burdening a fundamental right. Your Honor, with respect, I think the standard under the privileges and immunities clause is clear. Where there is a burden to a right within the ambit of the clause, of which the fundamental right of access to the courts is one, if the court finds a burden to such a right, you then have to ask for a substantial reason for the differential treatment. So I do think that it still requires a finding of a burden to a fundamental right. And, Your Honor, so the Supreme Court has long held that the fundamental right of access to the courts is not burdened by a statutory scheme. So assuming that we concluded that the fundamental right is burdened here, what is the substantial reason justifying that burden? Your Honor, the substantial reason is to create certainty for resident defendants who are subject to suits by non-resident plaintiffs. That they will, in all such cases, that they will be able to collect costs at the end of the litigation. How does that work when you have a non-resident plaintiff who owns property here and a resident plaintiff who is destitute? How would that analysis work? And why, given the fact that, I believe, this bond requirement would work, why has that been a rational legislative action? Your Honor, there may be situations in which that is the case. Under rational basis review, I think the legislature is entitled to make the judgment that non-residents, as a general matter, are more likely to lack significant property interests on the island. And therefore, in identifying that particular local evil, and I think this court is due to give deference to the legislature's judgment on that question. So even though the court may be able to consider hypothetical situations where that's the case, the legislature here, as an initial matter, was empowered to make the decision that it is more likely that non-residents will lack significant property interests and therefore the need for protection for resident defendants, in the case of suits by non-resident plaintiffs, is particularly heightened. And so that would be the substantial reason, Your Honors. And I would point out that the great weight of precedent on this issue, other courts who consider privileges and impunities clause and equal protection challenges to non-resident bond schemes, have found, well none of those courts have found, that it either burdens the fundamental right of access to the courts, or under the specific privileges and impunities clause question that Judge McKee asked, both the Ninth Circuit and the First Circuit, in Russell and in Hawes, declined to strike non-resident bonds justified on identical grounds as Section 547, Your Honors. How significant is the IFP provision, Your Honor? Your Honor, I think it's quite significant. So under Section 513 of the Virgin Islands Code, that is a sufficient safeguard for indigent parties to proceed in formal impoverished if they wish to do so. There was no 513 motion here, and the Superior Court noted that in its order dismissing the case for failure to pay the bond. After two years of the bond pending, it was not paid. There was never another motion to reconsider or to alter the bond, and there was never a motion to proceed in formal impoverished. So I think in evaluating the entire statutory scheme, Judge Skirga, it's important to consider that Section 513 does provide sufficient safeguards for indigent non-resident plaintiffs, indeed all indigent parties. Your Honors, if I could turn to some of, again, the key reasons why Section 547 does not burden the fundamental right of access to the courts, because I think this is important. First, the bond amount here is entirely discretionary, Your Honors, as is the court's decision to dismiss a case for failure to pay the bond. It's entirely within the Superior Court's discretion what bond amount to set, and if a bond is not paid, whether to dismiss it. The fact that it's discretionary can cut both ways. There's no guidance, there's no limit where there's a double limitation. That's right, Your Honors. But there's the fact of the discretion in and of itself, and that's where that comes through. Your Honor, I think that a discretionary bond amount is preferable to a prohibitively high minimum amount. There are some non-resident bond statutes in place all across the country, including in this circuit. Some do prescribe minimum amounts. I think having clear statutory caps with discretion for the Superior Court judge to decide a bond amount that will be both meaningful to individual defendants who may need certainty about their ability to recover costs at the end of litigation, and also to not be so prohibitively high that it, you know, somehow the other party is unable to pay the bond, I think that that discretion is actually preferable to a different kind of statutory formulation where there is no discretion, and the Superior Court judge sort of wrote the fine set bond amount that may not fit the facts and the needs of a particular case. Your Honors, I do just want to point out again that before the opinion below, no federal or state court to ever address a non-resident bond scheme under federal law has ever concluded that a non-resident bond either burdens the fundamental right at issue here or that it violates either of the substantive provisions before this court today. The Supreme Court in 1920 in the Egan case said of non-resident bonds that they have been imposed since early in our history and are not hostile to the fundamental rights of citizens. And then a year later in OMB, the court upheld a non-resident bond scheme that's not unlike the one here, except it applied to defendants and not to non-resident plaintiffs. And there the court said that special bails of non-residents is a long, familiar, and time-honored practice. And Egan was cited in 2013 in Burmey v. Young as good law. So these cases are very much alive and are with us. They are applicable to this case, Your Honors. And indeed, other federal circuits, I've noted a few, but the Ninth Circuit, the Seventh Circuit, New York State Courts, the District of Columbia, have all upheld non-resident bond statutes on similar grounds and none have found a burden to the fundamental right. Your Honors, again, because Section 547 doesn't burden a fundamental right to reasonable access to courts, no further inquiry is necessary under the Privileges and Immunities Clause. There's no burden to a right within the ambit of the clause. The inquiry ends. And under the Equal Protection Clause, because Section 547 does not burden a fundamental right, it should be upheld under only rational basis review. And the legitimate government interests, as we've already discussed today, are in creating certainty for resident defendants such that they will be able to collect costs against non-resident plaintiffs who are less likely to own the property. That's a rational inference for the legislature to draw, given, I think, the reasonable inference that non-residents will be, as a general matter, less likely to have significant property interests here on the island. And, again, other courts have upheld non-resident bonds on equal protection grounds on exactly the same sorts of arguments, Your Honors. I see that my time is about to expire, and in order to leave about a minute for a quick rebuttal, for the following reasons, we have to reverse the way we found the Supreme Court. Thank you. I'll be back in a moment. Very much. Good morning, Your Honors. My name is Dwyer Arce. I represent the Virgin Islands Bar Association. As you're aware, the Virgin Islands Bar Association has filed an amicus brief in this matter, urging this Court to dismiss the certiorari proceeding for lack of subject matter jurisdiction. Let me start. The pronunciation of your last name is Arce. Arce. Mr. Arce, is it your position that the Basin panel, which delivered an opinion that is really pivotal in this matter on the jurisdiction question, because it concluded the case was moot, that it did not have jurisdiction under U.S. Steel to reach the question of certiorari jurisdiction? That's correct, Your Honor, yes. As the Court clearly acknowledged in the Basin decision, and they used the word clearly, they clearly lacked Article III jurisdiction due to the fact that the case had been mooted while it was pending in this Court. Under Steel Co. and the cases that followed, including cases from this Court that predate the Basin decision, state very clearly that in the absence of Article III jurisdiction, a federal court lacks the substantive law to carry it out. Can you point to any cases where we have considered whether a prior panel actually had jurisdiction before deciding whether to give that panel's opinion in precedential status? Because I can't find it. I don't either. And I'm amazed that there is such a case. Your Honor, no. We are also not aware of any particular case in which this Court disagreed or chose to treat a previous panel decision as not controlling due to the fact that there was no jurisdiction. But this case is unique in a lot of respects. Which case? Not Basin, but the case before it?  The Basin case, Your Honor. The Basin decision is unique in many respects. The first of which, the most important of which being that the Courts went ahead and interpreted it as a matter of personal discretion, a federal statute, in the absence of Article III jurisdiction. So every case is different, Mr. Arce. But I ask you to think about this. How workable would it be for us as an appellate court to be renegading jurisdiction for every precedent brought to our attention? Well, of course that wouldn't be workable for every precedent brought to this Court. Well, aren't we opening the door to take the position you're taking? No, Your Honor. This case is so unique, as you just mentioned. It is so unique in that there is no case that is previously in the same posture as the Basin decision, where you have a panel of the Court recognizing that they lack Article III jurisdiction, yet rendering interpretation of a federal statute which is meant to be binding on future panels. In other cases in which there is Article III jurisdiction issued for this Court and for other federal courts, what the Courts say, first and foremost, is that Article III jurisdiction is always going to be seen to question. And that's a quote most recently stated by this Court, Justice Batchelet and Hamilton v. Bromley, where this Court clearly endures a sequential manner of addressing jurisdictional issues. First, they emphasize Article III jurisdiction is always going to be seen to question. And second, this Court held that the District Court had made a mistake in failing to address Article III jurisdiction before even reaching an issue of younger abstention, which is another threshold doctrine for a federal court declining their case. Obviously, and you've argued this in your brief, if we cannot find a way around the Basin, you would like this Court to reconsider the Basin in an ongoing way, right? Yes, Your Honor. So let's turn to looking at the statute itself. It talks about cases commenced. You've heard Q&A already that's taken place regarding some judicial policy concerns as well as the case backlog here in the Virgin Islands. Why wouldn't cases commenced include all cases commenced at the territorial court level as opposed to appeals commenced or certain petitions commenced? Yes, Your Honor. Well, you mentioned earlier the SLAC, the McDaniels case. Before we even talk about that case, the most important thing here is that we're dealing with a statute passed by Congress dealing with exactly one issue. That issue is which court has the ability to issue a written certiorari to the Virgin Islands Supreme Court. So when they use the language cases commenced, the only logical explanation is that they're referring to cases that are the subject of the statute, cases commenced, seeking certiorari review of the Virgin Islands Supreme Court. Well, I mean, isn't that in a sense, though, the underlying policy behind SLAC? I mean, in other words, the statute is focused on appellate jurisdiction or, more accurately, cert jurisdiction. Yes, Your Honor. So necessarily we should be looking to the appellate segment or unit of this as it has been described in some other cases as opposed to the entire life of a litigation. Yes, Your Honor. It's even stronger in this case than it even was in SLAC-McDaniels because this statute only deals with proceedings on cert from the Virgin Islands Supreme Court, whereas SLAC-McDaniels dealt with a statute that was broader, encompassed, you know, distressing properties, distressing proceedings outside of the appellate context. Perhaps you're arguing that the Basin Court misunderstood the concept of the federal judicial system? Well, Your Honor, the Basin decision failed to, respectfully, failed to appreciate the ramifications of the lack of article 3 jurisdiction and the fact that— Perhaps you're referring specifically to the territorial nature of what the statute is dealing with and analogizing the territorial portion of the statute to the state system as opposed to the federal system. The court in Basin talks about the federal system, and your brief makes the point that that misinterprets what's at stake here, what's at stake really here, is the Court of Alaska's work from the states, which is different than the federal system because the Virgin Islands Court was not in the federal system within the meaning of that term. Is that my misunderstanding of the brief? No, Your Honor. I see my time is up. You will keep going. Okay. Yes, Your Honor, that is one of the main points of the brief is that the Third Circuit, that this court failed in Basin to appreciate the differences between the territorial court system and the federal court system, that the Virgin Islands Supreme Court and the Virgin Islands Superior Court are, by the intent of Congress, meant to act in the same way as a state judiciary. They are meant to be separate from the federal system, have their own rules and procedures, and proceed in their own manner, subject to review by the U.S. Supreme Court on issues of federal law. Judge Sirica, let me let you get in here if you have questions of the evidence. Is the proper date, then, those petitions for certiorari that have been filed, or is it taking effect on the 1st? The date would be, Your Honor, December 28, 2012 is when the statute was enacted. Cases commenced would refer to certiorari proceedings that had been commenced by that date. So, for instance, at that time, there was one certiorari proceeding pending in this court. That was Kendall v. Virgin Islands State News. And the court in that case properly held that they retained the certiorari jurisdiction because the petition had been filed before the statute was enacted. Is the Savings Clause in 6116 meaningfully different from those that Congress included in relative law in Puerto Rico? Your Honor, it's entirely different. In none of those statutes is the term cases commenced used. Also, with regard to many of those, for instance, the First Circuit, the First Circuit reviewed cases from the Puerto Rico Supreme Court on appeal. An appeal as a right. It's different here in that the Third Circuit has never reviewed the Virgin Islands Supreme Court as a right or on appeal. It's been on discretionary proceedings for a writ of certiorari. It is distinguishable in that manner, and that, in a sense, explains why the term cases commenced was used. Cases commenced is a term that is used by the Supreme Court itself to refer to its own proceedings. So, for instance, when a new rule of procedure is promulgated by the U.S. Supreme Court, it applies to cases commenced after the date of promulgation, which the Supreme Court means to be certiorari proceedings commenced at the Supreme Court before the date of promulgation, as opposed to the court, to my knowledge, never looked back to the date of the complaint was filed in the federal trial. Mr. Arce, you are representing the bar of the Virgin Islands as the weakest in this matter, and you were undoubtedly aware that the bar has similarly appeared as an amicus in a previous case, correct? Yes. And I believe they have filed an amicus brief in the pending matter. Yes, Your Honor. We've also filed a similar amicus brief in threatening people of the Virgin Islands, which is now before the court as well. So it's safe to say that the Virgin Islands Bar Association and its members not only have strong views but have a strong interest in this particular issue as well? Yes, Your Honor. The Bar Association has a very strong interest in this issue. It's an issue that is fundamental to the administration of justice in the Virgin Islands. It's fundamental to the practice of law in the Virgin Islands, determining which court is the one that has the last say on issues of territorial law. It should be, and is meant to be by Congress, the Virgin Islands Supreme Court. To the extent that there remains an avenue before a federal court where a federal court can set aside a ruling of local law by the Virgin Islands Supreme Court, that remains an issue and that remains a concern of the Bar, and it will always be a concern of the Bar going forward. Judge Sirica, do you have any additional questions of the amicus? I do not. Thank you very much, Mr. Rusty. Thank you, Your Honor. Ms. Lawrence? May it please the Court? Good morning. My name is Rayelle Lawrence on behalf of the respondents addressing the merits of this appeal. As I was preparing for arguments this morning and last evening, my final preparations, it dawned on me that an issue here, either under the Equal Protection Analysis or under the Privileges and Immunities Analysis, is what is that government interest? What's the compelling interest with regard to the P.I. analysis? And what's the substantial reason with regard to the – I'm sorry, mix it up. What's the compelling interest in the E.P. and what's the substantial reasons under the P.I. analysis? And here, I'm still struggling to find that reason. Now, the government has had to intervene. Let me ask you this. You undoubtedly heard the cases discussed by Mr. Russo when he had his time at the podium. Are you aware of any cases, other than this one, in any court that concluded that a non-resident cost on statute was unconstitutional under the Equal Protection Analysis? Of the U.S. Constitution? No. Alaska analyzed their own constitution. Right. That was in the last constitution. Right. But no, that still does not mean that the P.I. Supreme Court erred in its analysis. Because recall, we're in a modern-day era where you can enforce a judgment relatively easily. There's electronic filing. Anywhere you go, you have to retain local counsel to be able to file a petition or enforce a judgment. So I'm not quite sure why – But what we have, I concede, is not a holding on the Supreme Court of the United States. But interestingly, the use as an example of a non-resident cost bond statute as the type of rule that does not burden the right to access the courts. That was in 1920. And I would think – I know they cited to it recently. We cite lots of old cases that remain good law. But if I may, Your Honor, that's not fair to the U.S. Supreme Court. Because in that case, they weren't directly asked the question. They referred to it as a tight honor tradition. But the specific issue of whether or not this violates the Privileges and Humilities Clause was not actually presented to them. We have jurisprudence that suggests – not only suggests, but that really compels us to take a close look at dicta from the Supreme Court. And it is dicta. I understand the court may look to that for guidance. But to say that the U.S. Supreme Court erred in its ruling by not – there is no precedent for the U.S. Supreme Court to have looked to from the U.S. Supreme Court that was binding on it. And if I may – Do you agree with Mr. Arce's formulation that in order to follow either the Equal Protection or Privileges and Humilities Clause, there has to be a burden as opposed to a discrimination? I don't believe so. Under the P.I., there's not necessarily a burden. You have to show that there is a discrimination. There is a law that discriminates between citizens. That wouldn't trigger constitutional protection, that would it? I'm sorry, I didn't – Discrimination is just – disparate treatment is basically irrelevant. It has no substantive meaning. Exactly. It's whether or not the state treats its citizens and residents versus non-residents. And the reason why – Follow me on this, because you said that it has to – that it's only discrimination. Mr. Arce, you argued pretty persuasively, and I think you may be right, that it has to be burdening. And that's why I asked you whether or not if discrimination is just a facto, not in the technical felicitative case, but if it's basically insufficient, that would not trigger constitutional protection, would it? Would it have to be more significant than that? Well, you have to identify that there is a burden. Burden, that's what I'm trying to get to. Yeah, but we have – there clearly is a burden here. Well, given the Section 513, how is it a burden? I'm sorry. If – simply because somebody qualifies as indigent and can get out of the cost bond, does it mean that the person who isn't, who has money to pay the cost bond, isn't burdened? I mean, everybody pays the $75 filing fee. The person is burdened, but if their right is burdened. Their right has to be burdened. They're still able to get into court. It costs them – the $1,000 out of their pocket is going to be more significant than the $1,000 out of the pocket of the guy who moved the decimal point further away from the counter, but I used my other hypothetical. So the individual may be burdened to some extent, for lesser or more, but the right to access the court is not going to be burdened because they can still get into court. But, Your Honor, that's not the analysis. The analysis, as I understand it, is once you identify that there is a burden, you don't have to look at the reason for the burden. Is there a burden? That's what I'm trying to get at. There's a burden, and – but you're saying – and a class who cannot afford that, but have available to them the IFP PAC, where is the burden? We do that by a year of filing fees. But – and the citizens and residents pay the filing fee, the $75, and what we're saying is the non-residents have to pay more. They have to repurpose funds that they would have used to be able to buy the CHPAC, who knows, and now deposit it into the court system. So that is a burden, and it is a substantial burden because you're taking their money that they could have used for something else and now making it the temporary property of the court system. And the idea that they could afford to do it means that it's not as burdened. Does that impose a significant hurdle to getting into the courts? Is it a burden to the right of access? I believe it is, Your Honor, and the reason why I say this is because this is the Virgin Islands, and the treatment of non-residents differently is a significant problem. This territory is funded based on tourism. We advertise strongly for people to go out, people from all over to come here. And if we're saying now they're injured in our territory, you now have to pay more money to have access to our court system for redress. Because recall, if you get food poisoned – if you're a tourist and you get food poisoned or you slip and fall somewhere in this territory, you can't file your suit. Can you please tell us against the defendant you have to file it? You're not suggesting, given the interest in tourism, that those things ever happened here? I'm not saying. I'm taking the hypothetical. You want a positive answer? Yeah. In the hypothetical, I'm saying. Let me get Judge Sorreca in here. Judge Sorreca, before – can I have you ask any questions of Ms. Lawrence? I think Judge McKee and you, Chief Judge, have asked the questions that I would have asked. All right. Could you just wrap up, please? Thank you. So it's our position that if you're looking – you truly are looking at the local equals. There is no difference between a resident and a non-resident. And given how easy it is in modern residency laws to establish residency, there really is no logical connection between residency and non-residency and access to property here or abroad. And we would submit that the U.S. Supreme Court did not err in its analysis and that their order be affirmed. Thank you very much, Ms. Lawrence. Mr. Russo, we'll have you back in rebuttal. Thank you, Your Honor. Just two brief points of rebuttal. First, Chief Judge Smith, you are exactly right that the United States Supreme Court has pointed, at least in two instances – there are older cases – to non-resident bonds as precisely the kinds of statutory schemes that do not offend the Privileges and Immunities Clause. And although it is an old case, old cases are good law. Sometimes old judges are good judges. That's right, Your Honor. That's right. When I get there, you can let me know. Your Honor, these cases are not so old, either. In McBurney in 2013, the United States Supreme Court cited the Egging case in its discussion of the right of access to the courts. So these cases are very much alive and well and applicable to this case. Second, Your Honors, and I think most importantly, there is confusion about the standard that is applicable here under the Privileges and Immunities Clause. And I believe, Judge McKee, you are exactly right. The standard here is that you do need to conclude that there is a burden to a fundamental right within the eminent of the clause in order for there to be a violation. And to inquire about a substantial reason under the Privileges and Immunities Clause. And with respect, this is where Respondent's argument fails. It is not enough to identify how a statutory scheme implicates a particular fundamental right. One has to describe how important it is. Your Honors, ultimately, we ask that you join the clear consensus of federal and state courts to address nonresident bonds under federal law. And holding that Section 547 violates neither the Equal Protection Clause nor the Privileges and Immunities Clause. We ask that you reverse the Virgin Islands Supreme Court. Thank you very much, Mr. Russo. And thank you all. This is, as all of you know, and the panel recognizes, in and of itself, an important case in many respects. The jurisdictional question presented is important in terms of the case. Of course, it's important. It strikes me what a great example this case is of the entire system in action where we have competing private living units. We have the Bar Association coming in as an amicus in an effort to protect important interests. We have students here, Russell students, who are obviously more than buddy advocates. They've already achieved the status of accomplished advocates, and we thank them very much. This is an interesting case, and counsel have helped us a great deal. We'll be taking other advisement. Professor, I assume that you know my friend Professor Schwartzman? Yes, very well, Your Honor. I rely on him on a regular basis for his assistance and recommendations. He is a good person to rely on. Thank you very much. We thank counsel again for your helpful arguments. We'll take the matter under advisement, and we'll ask that the Court adjourn.